UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

WILLIAM L. SHUPE,                          :

                       Plaintiff,        :

        - against -                        :

MICHAEL J. ASTRUE,                         :
Commissioner of Social Security,

                          :

                     Defendant.
----------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
BARBARA S. JONES**[*]

07 Civ. 7961 (BSJ)(FM)

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 8/3/10 _____

**FRANK MAAS**, United States Magistrate Judge.

       Plaintiff William L. Shupe ("Shupe") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), to seek review of a final

decision of the Commissioner ("Commissioner") of the Social Security Administration

("SSA") denying his application for Social Security Disability Insurance benefits.  Shupe

has moved, and the Commissioner has cross-moved, for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth

below, I recommend that (a) Shupe's motion be denied, and (b) the Commissioner's

motion be granted.

---

[*]       This Report and Recommendation was prepared with the assistance of Greg
Mann, a student at the Benjamin N. Cardozo School of Law.

I.      Background

        A.      Procedural History

        On October 8, 2002, Shupe applied for Social Security Disability Insurance benefits, alleging disability beginning December 6, 2001.  (See Tr. 120-23).[1]  Shupe claimed that he was disabled because of back, shoulder, and leg pain.  (Id.).  After Shupe's application was denied initially, he requested a hearing before an administrative law judge ("ALJ").  (Id. at 38).  ALJ Dennis Katz then held a hearing on December 3, 2004 ("Hearing I").  (Id. at 562-81).  On January 11, 2005, the ALJ issued a decision denying Shupe's claim.  (Id. at 77-87).  Thereafter, Shupe requested review of the ALJ's decision.  (Id. at 88-89).  The Appeals Council granted Shupe's request for review, vacated the hearing decision, and remanded the case for further consideration of Shupe's residual functional capacity ("RFC") and for testimony from a vocational expert.  (Id. at 92-95).

        On May 19, 2006, a second hearing was held before ALJ Katz ("Hearing II").  (Id. at 582-611).  During this hearing, Shupe raised an additional claim of disability based on mental impairments attributable to an adjustment disorder and depression.  (Id. at 588-89).  ALJ Katz considered the case de novo and, on June 21, 2006, issued a decision denying Shupe's claim.  (Id. at 17-30).  On May 17, 2007, the Appeals Council denied Shupe's request for review, rendering the ALJ's decision final.  (Id. at 9-11).

---

        [1]      "Tr." refers to the certified copy of the administrative record filed with the Answer.  (Docket No. 5).

Shupe commenced this action on September 4, 2007.  (Docket No. 1).  On or about November 19, 2008, Your Honor referred the case to me.  (Docket No. 6).  Thereafter, on February 2, 2009, Shupe filed his motion for judgment on the pleadings pursuant to Rule 12(c).  (Docket No. 8).  On March 5, 2009, the Commissioner filed his cross-motion for judgment on the pleadings.  (Docket No. 10).  Shupe submitted a reply to the Commissioner's motion on March 18, 2009.  (Docket No. 12).  No further papers have been received.

The issue presented by both motions is whether the ALJ's determination that Shupe was not disabled within the meaning of the Act is legally correct and supported by substantial evidence.  (See Comm'r's Mem. at 1 (Docket No. 11); Shupe's Mem. at 3 (Docket No. 8)).

II.     Relevant Facts

A.     Non-Medical Evidence

Shupe was born on August 11, 1967.  (Tr. 120).  He completed high school through a GED program.  (Id. at 150).  At the time of Hearing II, Shupe was thirty-eight years old and lived alone.  (Id. at 582, 592).  Shupe did his own shopping, managed his own finances, and was able to drive, read newspapers, and send e-mails using his computer.  (Id. at 590-92, 596).  Shupe also could brush his teeth and shower without assistance.  (Id. at 590).  He testified that his girlfriend occasionally helped him around the house.  (Id. at 596-97).

Shupe's most recent employment was in 2001 when he worked as a carpenter.  (Id. at 153-56).  He also has past work experience as a service technician repairing sports equipment in homes and businesses and as a production manager for a band for which he set up stage equipment.  (Id.).  Shupe testified that he stopped working as a carpenter because he injured his back at work on December 6, 2001, while unloading heavy doors from a truck and bringing sheetrock down a staircase.  (Id. at 566).  The day after this incident his back "locked up."  (Id.).

With respect to his daily functioning, Shupe testified at Hearing I that he has difficulty walking for prolonged periods or standing for more than one-half hour.  (Id. at 574).   At Hearing II, Shupe testified that he also has difficulty with repetitive activities involving his back and right shoulder.  (Id. at 594).  According to Shupe, he has "good days and bad days."  On a bad day, when his pain level is a "10" on a scale of "1" to "10," he needs to lie down most of the day until the pain subsides.  (Id. at 595).  Shupe conceded, however, that he has bad days only a few times each month.  (Id.).  When he suffers from back and shoulder pain, Shupe has difficulty concentrating and sleeping.  (Id. at 589, 592, 597).  He stated at Hearing II that he spends most of his time at home, except when he goes to physical therapy.  (Id. at 591).

Shupe declined back surgery recommended by his doctors because the Worker's Compensation Board did not "want to take responsibility for" a cyst in the area of the spine to be fused.  (Id. at 569).  He testified that he "g[o]t along" with his doctors and most of his family members.  (Id. at 590).

4

Donald Slive, a vocational expert whose credentials were not challenged, testified at Hearing II about the jobs that a person of Shupe's age, education, and work experience could perform if he were able to stand and walk for four hours, lift eight-pound items occasionally with his right dominant arm, lift ten pounds frequently with his left arm, and sit for eight hours during an eight-hour workday, but required a one minute "stretch break" about every hour or so.  (Id. at 600-01).  Slive indicated that such a person could perform sedentary, unskilled functions; for example he could work as a charge account clerk, a document preparer, or a surveillance systems monitor.  (Id. at 601-02).

In response to a second hypothetical, Slive stated that a person who could sit for only four hours each day, could not lift objects weighing more than a few pounds with his dominant arm, and could not bend, twist, or stoop would have fewer work options but still could work as a surveillance systems monitor.  (Id. at 603).  He testified further that these additional limitations would "narrowly reduce the base of sedentary unskilled jobs."  (Id.).

The ALJ also asked Slive what jobs a person could perform if he were able to sit for only one-half hour before having to get up to move around or lie down.  (Id. at 607).  Slive responded that a person who had to lie down during the workday would not qualify for any jobs in the national or local economy.  (Id. at 608).

5

B.    Medical Evidence

1.    Physical Impairments

On January 2, 2002, less than one month after his back first locked up,

Shupe underwent a magnetic resonance imaging scan ("MRI") of his lumbar spine.  (Id.

at 221-22).  The MRI revealed herniated or bulging discs at the L3-L4, L4-L5, and L5-S1

levels.[2]  (Id.).  On January 7, 2002, Shupe also had an MRI of his right shoulder, which

led to a finding of tendinopathy[3] of the distal supraspinatus tendon[4] as well as

impingement syndrome.[5]  (Id. at 219-20).

a.    Drs. Scheinfeld, Stern, and P.A. Albanese

On January 17, 2002, Shupe began treatment with Dr. Barry Scheinfeld, a

physician, at Catskill Physical Medicine and Rehabilitation, L.L.C. ("Catskill").  (Id. at

237-38, 250).  Dr. Scheinfeld found that Shupe could reach his knee-cap level when he

flexed forward from his lumbar spine.  (Id. at 237).  Shupe had positive straight-leg raising

---

[2]    The L1-L5 vertebrae are in the lumbar or lower back region of the spine and are immediately above the S1 vertebra which is in the sacral region of the spine.  See Apparelyzed, http://www.apparelyzed.com /spine.html (last visited July 28, 2010).

[3]    Tendinopathy consists of "two conditions that are likely to occur together:  tendon inflammation, known as tendinitis, and tiny tears in the connective tissue in or around the tendon, known as tendinosis." WebMD, http://www.webmd.com/hw-popup/tendon-injuries-tendinopathy (last visited July 28, 2010).

[4]    The supraspinatus is an "intrinsic (scapulohumeral) muscle of [the] shoulder joint, the tendon of which contributes to the rotator cuff."  Scapulohumeral means "relating to both [the] scapula and humerus."  Stedman's Medical Dictionary (27th ed. 2000) ("Stedman's").

[5]    Impingement syndrome, also known as supraspinatus syndrome, is "pain on elevation of the shoulder and tenderness on deep pressure over the supraspinatus tendon." Stedman's.

at sixty degrees on the right and seventy degrees on the left.  (Id. at 237).  Dr. Scheinfeld

diagnosed Shupe with disc herniations, disc degradation, and severe tendinopathy,

determined that he was "temporarily totally disabled from returning to work as a

carpenter," and recommended physical therapy.  (Id. at 237-38).  Shupe subsequently

began physical therapy at Catskill on January 23, 2002.  (Id. at 247).

On February 14, 2002, Dr. Scheinfeld assessed Shupe's progress and found

an improved range of motion in his lower back.  (Id. at 236).  Shupe was able to bend to

his midcalf level, although he still had a mild impingement of the right shoulder and

difficulty performing certain activities that required standing.  (Id.).

On March 27, 2002, Dr. Scheinfeld referred Shupe to a neurosurgeon, Dr.

Jack Stern.  (Id. at 217).  Dr. Stern found that Shupe was "markedly limited by his pain,"

but had no neurological deficits.  (Id.).  Dr. Stern confirmed the MRI results, noting a

"traumatic disruption" at L4-L5, and expressed the opinion that Shupe was a "good

candidate" for a surgical spinal fusion.  (Id.).  Dr. Stern further requested authorization

from the Worker's Compensation Board for a discogram[6] to determine whether surgery

was necessary.  (Id.).

---

[6]        A discogram is a "radiograph of an intervertebral disk made after an injection of a
radiopaque substance."  U.S. National Library of Medicine, National Institutes of Health,
Medline Plus Medical Encyclopedia, Discogram, http://www2.merriam-webster.com/cgi-bin/
mwmednlm?book=Medical&va=discogram (last visited July 29, 2010).

On April 10, 2002, one of the therapists treating Shupe at Catskill noted that Shupe had stated during a physical therapy session that he was "working construction on the side while out on Worker's Comp."  (Id. at 243).

On April 11, 2002, Shupe visited Dr. Scheinfeld, who noted that Shupe exhibited radicular symptoms.[7]  (Id. at 235).  Dr. Scheinfeld also found that Shupe suffered from muscle spasm and was limited in his ability to flex or extend his back.  (Id.). Shupe experienced pain on straight-leg raising at sixty degrees bilaterally.  (Id.).  Shupe's deep tendon reflexes were intact, but he had mild weakness in the extensor hallucis longus muscle.[8]  (Id.).

That same day, Dr. Scheinfeld sent a letter to an attorney in Monticello, New York, who evidently was assisting Shupe with his Worker's Compensation claim.  Dr. Scheinfeld indicated in the letter that Shupe had "vehemently denie[d]" working off the books and "became quite upset and angry" when the subject was broached.  (Id. at 234). On May 1, 2002, Dr. Stern re-examined Shupe noting that Shupe's symptoms had "become increasingly worse."  (Id. at 215).  Dr. Stern also resubmitted a request for a discogram.  (Id. at 214-15, 474-75).

---

[7]    Radicular pain is pain that stems from irritation of the nerve roots and which can travel down the leg.  See MedicineNet http://www.medicinenet.com/pain_management/page2.htm (last visited August 2, 2010).

[8]     The extensor hallucis longus is a muscle of the anterior compartment of the leg. Stedman's.

On May 9, 2002, Robert Albanese, a physician's assistant at Catskill, examined Shupe and found that he could walk without obvious discomfort.  (Id. at 233). Mr. Albanese also noted that Shupe had weak abdominals and that he experienced "palpable pain" when he bent down to his mid-calf level.  (Id.).  In his report, Mr. Albanese said that Shupe was "temporarily totally disabled" and should not push, pull, or lift heavy objects.  (Id.).  It appears that the report was intended for the New York Workers' Compensation Board since Albanese requested authorization for an additional six weeks of thrice-weekly physical therapy.  (Id.).

On June 6, 2002, Dr. Scheinfeld noted that Shupe's deep tendon reflexes at his knees and ankle were intact and that there was no gross muscle weakness.  (Id. at 232). Dr. Scheinfeld also noted that Shupe complained of pain on straight-leg raising at sixty degrees, but walked without obvious discomfort.  (Id.).  Dr. Scheinfeld nevertheless found that Shupe remained "temporarily totally disabled."  (Id.).

At a follow-up examination on July 9, 2002, Dr. Scheinfeld determined that Shupe could flex forward to below the kneecap level, but that he experienced pain when raising back up.  (Id. at 231).  Shupe had "palpable tenderness over the lumbar" area of his spine and his straight-leg raising still was positive at sixty degrees.  (Id.).  Dr. Scheinfeld opined that Shupe was "currently totally disabled."  (Id.).  Subsequently, after July 29, 2002, Shupe ceased reporting for physical therapy.  (Id. at 239).

b.      Dr. Denise McHale

On April 30, 2002, Dr. Denise McHale, a neurologist, examined Shupe on behalf of the New York Workers' Compensation Board.  (See id. at 466-70).  Once again, Shupe could only do straight-leg raising to sixty degrees, but Dr. McHale attributed this to "tight hamstrings."  (Id. at 469).  After reviewing Shupe's MRI, Dr. McHale concluded that fusion surgery would likely be the appropriate remedy.  (Id. at 470).  In an addendum to her report in June 2002, Dr. McHale further concluded on the basis of her prior examination that Shupe was "temporarily totally disabled" and should not bend, lift, or be exposed to vibrations.  (Id. at 459).

c.      Dr. Christopher Melcer/C.B.M./Dr. Segal

Shupe subsequently began treatment with Dr. Christopher Melcer, a physician at C.B.M. Medical, P.C. ("C.B.M.").  (Id. at 453).  In a report dated August 2, 2002, Dr. Melcer reported that Shupe had no difficulty walking but experienced stiffness after bending or sitting for more than one-half hour.  (Id.).  Shupe had a full range of motion in his shoulders, hips, and cervical spine.  (Id.).  Dr. Melcer concluded that Shupe had "chronic musculoskeletal pain of the right shoulder and lumbosacral area."  (Id.).  Dr. Melcer further recommended physical therapy three times per week for four to six weeks. (Id.).

On September 3, 2002, Shupe met with Dr. Kamil Mustafa, a specialist in anesthesiology and pain management at C.B.M.  (Id. at 452).  Dr. Mustafa reported that Shupe's lower back pain worsened with bending and lifting and that the range of motion in

10

his lumbosacral spine was limited.  (Id.).  Dr. Mustafa's diagnosis was "[r]uleout [sic] lumbosacral radiculopathy [and] myofascial pain syndrome."[9]  (Id.).  He also recommended that Shupe continue with physical therapy.  (Id.).

Shupe again met with Dr. Melcer on September 20, 2002, at which time Shupe complained that he could not sit for more than one hour while driving.  (Id. at 451).  Shupe also complained of pain in his right shoulder, which was  "intermittent" and usually exacerbated by activities that he had to perform steadily for more than ten minutes.  (Id.).  On examination, Shupe had a full range of motion in his shoulders.  (Id.).  Shupe also had full range of motion in his cervical and lumosacral spine, but experienced pulling and tightening at the limits of motion.  (Id.).  He could squat and perform heel and toe walking without difficulty.  (Id.).

During a visit on October 18, 2002, Dr. Melcer noted that Shupe's right shoulder pain was exacerbated during abduction and circumduction,[10] and that he had lower back pain when bending and lifting heavy objects.  (Id. at 450).  Dr. Melcer once again found, however that Shupe had a full range of motion in his right shoulder.  (Id.).  Shupe also had a full range of motion in his lumbosacral spine, although he felt pain at sixty degrees flexion, and had intermittent pain in his left thigh.  (Id.).

---

[9]      The term "myofascial" relates to the "fascia surrounding and separating muscle tissue."  Stedman's.  A fascia is a "sheet of fibrous tissue that envelopes the body beneath the skin; it also encloses muscles and groups of muscles, and separates their several layers or groups."  Id.

[10]      Abduction is the movement of a body part from the body's median plane; circumduction is the movement of a body part in a circular direction."  Stedman's.

On November 22, 2002, Shupe complained to Dr. Melcer that his lower back pain was exacerbated by "repetitive movement and sitting in a car." (Id. at 449). Dr. Melcer again noted that Shupe had a full range of motion in his right shoulder, but with pain at the limits of motion. (Id.). Dr. Melcer also found a full range of motion at the cervical and lumbosacral spine. (Id.). Shupe did not have any pain when his right shoulder was in a neutral position. (Id.). Dr. Melcer recommended further physical therapy and prescribed Vicoprofen.[11] (Id.).

During an examination on December 27, 2002, Dr. Melcer reported that Shupe had a full range of motion in the right shoulder, but limitations with internal rotation. (Id. at 448). Dr. Melcer stated that Shupe's medical status was "essentially status quo." (Id.). He renewed the Vicoprofen prescription and recommended continued physical therapy. (Id.).

In or around January 2003, Dr. Melcer referred Shupe to Dr. David Segal, a neurosurgeon. (See id. at 278). Shupe reported to Dr. Segal that bending forward and sitting for prolonged periods were difficult for him. (Id.). Shupe measured his pain as a "3-5" on a "1-10" scale, but as a "7-8" with exertion. (Id.). Dr. Segal examined Shupe and noted "tenderness to palpation" in Shupe's lower back although his straight-leg raising was negative. (Id.). Dr. Segal also observed that a prior MRI disclosed a bulging disc at L4-L5 and bone edema. (Id.). He recommended a second MRI of Shupe's lumbosacral

---

[11]     Vicoprofen combines the opioid analgesic hydrocodone with the non-steroidal anti-inflamatory agent ibuprofen. Physicians' Desk Reference (2008 ed.).

spine.  (Id. at 274-75, 279).  The radiologist who performed that MRI on March 17, 2003, found that Shupe had chronic disc protrusions at L3-L4 and L5-S1 and "relative stenosis" at L4-L5.  (Id. at 275-76).

Shupe continued to see Dr. Melcer monthly from January 2003 through August 2004.  (Id. at 413-28, 432-47).  During these visits, Shupe reported having pain after prolonged standing, driving, lifting, bending or repetitive range of motion.  (Id. at 419-28).  Dr. Melcer found that Shupe had essentially a full range of motion in his right shoulder and lumbosacral spine, with mild restrictions.  (Id.).

On April 8, 2003, Dr. Melcer reported that the Workers' Compensation Board had authorized shoulder surgery for Shupe, but that Shupe had declined the procedure because his range of motion was within normal limits and because his pain was "only exacerbated with prolonged "repetitive activit[ies]."  (Id. at 426).

On September 24, 2004, Dr. Melcer completed a Medical Source Statement related to Shupe's ability to perform work-related activities.  (Id. at 462-65, 476-80).  Dr. Melcer reported that Shupe could stand and/or walk for less than two hours in an eight-hour workday.  (Id. at 462).  Dr. Melcer also reported that Shupe must "periodically alternate between sitting and standing to relieve pain or discomfort."  (Id. at 463).  Shupe also was limited in pushing and/or pulling in both upper and lower extremities.  (Id.).  With regard to postural limitations, Dr. Melcer found that Shupe could balance and kneel occasionally, but that he could never climb, crouch, crawl, or stoop.  (Id).  Dr. Melcer stated that Shupe also was "unable to sustain long periods of bending or repetitive bending

and twisting." (Id.).  Shupe could reach occasionally and could handle, finger, and feel constantly.  (Id. at 464).  He could occasionally lift less than ten pounds.  (Id. at 462).

After a hiatus of approximately one year, Shupe resumed regular treatment with Dr. Melcer in August 2005.  (Id. at 493, 530).  Dr. Melcer's monthly reports from August 2005 through April 2006 indicate that Shupe continued to feel pain during prolonged sitting and driving.  (Id. at 486-93, 523-30).  Shupe's pain worsened with repetitive range of motion, heavy lifting, and overhead activity.  (Id.).

On May 22, 2006, Dr. Melcer completed a second Medical Source Statement.  (Id. at 549-52).  Dr. Melcer again reported that Shupe could stand and/or walk for less than two hours in an eight-hour workday, had to alternate between sitting and standing, and was limited in both upper and lower extremities when pushing and/or pulling.  (Id. at 549-50).  Dr. Melcer reported deterioration with regard to some of Shupe's postural limitations, indicating that Shupe never could balance or kneel in addition to the activities that he previously said were off limits.  (Id. at 550).  Dr. Melcer reported progress, however with regard to some of Shupe's manipulative limitations, stating that Shupe was now unlimited in reaching, fingering, and feeling.  (Id. at 551).

On July 28, 2006, Dr. Melcer requested an MRI of Shupe's right shoulder to examine a suspected tear.  (Id. at 546, 553-54).  The MRI indicated mild "focal partial

tearing in the middle bursal and distal articular supraspinatus and infraspinatus[12] tendons, respectively." (Id. at 553-54).

One month later, on August 25, 2006, Shupe underwent an MRI of his cervical spine. (Id. at 547). This MRI revealed a C3-C4 disc herniation and a risk of "right-sided foraminal compromise."[13] (Id.). The radiologist noted that he could not exclude "exiting nerve root compression." (Id.) (block capitalization deleted).

### d.   Dr. Caleb Medley

In October 2002, in addition to being treated by Dr. Melcer, Shupe began seeing Dr. Caleb Medley for treatment of his right shoulder. (Id. at 256). In a report to the state agency dated December 3, 2002, Dr. Medley indicated that Shupe suffered from supraspinatus tendinopathy and impingement syndrome of the right shoulder. (Id.). Shupe had pain after heavy lifting and repetitive motions of his right shoulder. (Id.). That same day, in a follow-up visit report, Dr. Medley indicated that Shupe had a full range of motion of the right shoulder and no pain when the shoulder was not being used. (Id. at 261). Shupe had limitations with pushing and pulling, but no limitations with sitting, standing or walking. (Id. at 259).

Shupe again saw Dr. Medley on January 7, 2003. (Id. at 284). Dr. Medley reported that Shupe had experienced pain in his right shoulder while trying to push a

---

[12]   The infraspinatus is an "intrinsic (scapulohumeral) muscle of [the] shoulder joint, the tendon of which contributes to the formation of the rotator cuff." Stedman's.

[13]   A foramen is "an aperture or perforation through a bone or membranous structure." Stedman's.

"large sized dog."  (Id.).  Dr. Medley's impression was right shoulder impingement
syndrome and supraspinatus tendinopathy.  (Id.).  He referred Shupe to Dr. Bradley
Wiener, an orthopedic surgeon within his medical group, to assess the need for
arthroscopic surgery.  (Id.).

                    e.      Dr. Wiener

          On January 21, 2003, Dr. Wiener found that Shupe suffered from right
shoulder impingement syndrome, but had minimal tenderness of the anterior and lateral
aspects of his right shoulder.  (Id. at 282, 455-56).  Dr. Wiener recommended that Shupe
resume physical therapy.  (Id. at 456).  He also requested that the Workers' Compensation
Board authorize arthroscopic surgery with "possible mini open repair and postop physical
therapy."  (Id.).

          Shupe returned to Dr. Wiener for a follow-up visit on October 19, 2004,
after complaining that he could not sleep at night because of pain on his right side.  (Id. at
454).  On examination, Shupe could elevate his right shoulder forward 160 degrees, abduct
170 degrees, internally rotate at L1, and externally rotate sixty degrees.  (Id.).  Dr. Wiener
noted that Shupe had no sensory or motor dysfunction in his right shoulder.  (Id.).
Observing that it had been over two years since the onset date and that conservative
treatment had proved ineffective, Dr. Wiener again requested Workers' Compensation
Board authorization for right shoulder arthroscopic surgery.  (Id.).

                                        16

f.      Dr. John King

On December 12, 2002, Shupe was examined by Dr. John King, an orthopedic surgeon serving as a consultative examiner for the SSA.  (Id. at 252-54). Shupe told Dr. King that he could not sit for more than one-half hour and that standing or walking increased his pain.  (Id. at 253).  On examination, Dr. King found that Shupe could do straight-leg raising to fifty degrees, although this caused lower back and upper posterior thigh pain.  (Id.).  Shupe's toe and heel walking and his gait were normal.  (Id.). Shupe could flex forward fifty degrees, but only with pain.  (Id.).  He could flex and abduct his right shoulder 170 degrees.  (Id.).  Dr. King concluded that Shupe suffered from lumbosacral arthritis and disc disease and impingement of his shoulder.[14]  (Id.).  Dr. King advised Shupe to avoid lifting at or above his right shoulder and to avoid bending and stooping repetitively.  (Id. at 254).

g.      Dr. Paul Jones

On November 9, 2006, Shupe met with Dr. Paul Jones, an orthopedic surgeon who evaluated Shupe in connection with his Workers' Compensation claim.  (Id. at 555-58).  Dr. Jones previously had examined Shupe on April 13 and October 14, 2004. (Id. at 556).  Dr. Jones found that Shupe possessed a normal range of motion in the cervical area of his spine and slightly diminished grip strength on his right side.  (Id. at 556).  Shupe also had some limitations of motion in his right shoulder and lumbar spine.

---

[14]      Although the report refers to Shupe's left shoulder, Dr. King undoubtedly meant Shupe's right shoulder, since Shupe has never complained about his left shoulder.

(Id. at 556-57).  His lumbrosacral junction and right sacroiliac joint were tender.  (Id. at 556).

Dr. Jones concluded that Shupe appeared to have an internal derangement of the right shoulder and possibly cervical radiculopathy.[15]  (Id. at 557).  Dr. Jones stated that Shupe needed an electromyography ("EMG") of his right shoulder to determine the extent of his cervical problems.  (Id.).

Dr. Jones also examined Shupe's lower back and stated that he would defer to pain management since Shupe had declined fusion surgery and other surgical alternatives would not be helpful.  (Id.).  Dr. Jones noted that Shupe's physical therapy produced only temporary improvements and that he did "not think that he will recover from his problems with continued therapy."  (Id.).

h.   Nerve Conduction Study

On January 10, 2007, after his date last insured, Shupe underwent a nerve conduction test administered by Dr. Sunitha Polepalle, but declined an EMG.  (Id. at 7, 133, 559).  The nerve conduction test revealed moderate right median nerve entrapment at the wrist (i.e., carpal tunnel syndrome) and mild ulnar sensory neuropathy.[16]  (Id. at 559).

_____

[15]   Cervical radiculopathy is "the damage or disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed.  Damage to nerve roots in the cervical area can cause pain and the loss of sensation in various upper extremities, depending on where the damaged roots are located."  WebMD, http://www.webmd.com/ pain-management/pain-management-cervical-radiculopathy (last visited July 29, 2010).

[16]   Neuropathy is a "classical term for any disorder affecting any segment of the nervous system."  Stedman's.

i.      State Agency Review

In February 2003, a State Agency Adjudicator, who apparently is not a physician, completed a Physical Residual Functional Capacity Assessment form concerning Shupe.  (Id. at 263-68).  After considering Shupe's medical records, the reviewer concluded that Shupe could sit, stand, and walk for about six hours in an eight-hour workday, occasionally lift twenty pounds, and frequently lift ten pounds.  (Id. at 264).  In the section of the report asking for the bases for these conclusions, the adjudicator cited the physical therapist's note dated April 10, 2002, which referred to a statement in which Shupe allegedly admitted that "he had been working construction on the side while out on Worker's Comp."  (Id.) (block capitalization omitted).  The assessment form also notes that Shupe had "vehemently denied" making any such statement.  (Id. at 264).

j.      Dr. Steven Jacobs

On March 5, 2004, Shupe met with Dr. Steven Jacobs for a neurological consultation.  (Id. at 471).  Dr. Jacobs found that Shupe could do positive straight-leg raising bilaterally at fifty degrees.  (Id.).  Dr. Jacobs further found that Shupe did not have any focal motor or sensory deficits and that his reflexes were symmetric.  (Id.).  Citing the opinions of Shupe's previous neurosurgeons and his MRI, Dr. Jacobs recommended lumbar fusion surgery at L4-L5 and L5-S1 as well as decompression at L3-L4.  (Id.).

2.      Mental Impairments

Shupe mentioned certain mental impairments to the ALJ during Hearing I, but declined to include them as part of his disability claim.  (Id. at 573-74).  During

19

Hearing II, however, Shupe testified that he was depressed and saw a psychologist who concluded that he had an adjustment disorder.  (Id. at 588).

Shupe's medical records show that on August 30, 2005, he met with a psychiatrist, Dr. Jeffrey H. Newton, who reviewed certain of Shupe's medical records, including the report of Dr. Donald Davis, a neurosurgeon, dated July 9, 2003; the doctor also examined Shupe.  (Id. at 481-85, 518-22).  Shupe appeared agitated and complained about the care he had received for his medical problems.  (Id.).  Dr. Newton observed that Dr. Davis had attributed Shupe's "complaints of pain (in part at least) to the claimaint's (lack of) motivation to return to the carpentry work he had been doing."  (Id.).  Dr. Newton found no symptoms of psychosis or severe depression.  (Id.).  Dr. Newton noted, however, that Shupe's "agitation appeared to be barely contained."  (Id.).  He diagnosed Shupe with an adjustment disorder with mixed emotional features, but found that this disorder was not itself disabling.  (Id. at 484-85).  Citing the fact that at least one of Shupe's "independent examining physicians" had suggested that there was a "significant, subjective component" to his pain, Dr. Newton recommended further psychotherapy.  (Id. at 485).

Shupe was treated by Dr. Robert P. Nussbaum, a psychologist, who subsequently reported to the Workers' Compensation Board that Shupe suffered from "depression, sadness, irritability, loss of interest, sexual dysfunction, stress, hopelessness, social isolation, sleep disturbance, worries, fatigue, restlessness and/or feeling keyed up at times, concentration problems, and pain."  (Id. at 115-17; see also id. at 118-19, 510-14).

20

Dr. Nussbaum observed further that Shupe "seem[ed] disabled by pain concentration problems . . . and low self esteem consequential to his injuries." (Id. at 115).  It appears that after the Worker's Compensation Board ceased paying for Dr. Nussbaum's services, Shupe's attorney was unable to acquire further medical records from him. (Id. at 114).

C.   ALJ Decision

Following Hearing II and his review of the record, ALJ Katz concluded that Shupe had not been under a disability within the meaning of the Act since his alleged onset date of December 6, 2001.  (Id. at 29-30).  At Step One, the ALJ considered Shupe's earnings records and determined that Shupe had not engaged in "substantial gainful activity" since his alleged onset date.  (Id. at 21).  At Steps Two and Three the ALJ found that Shupe had "severe" back and shoulder impairments, but that they did not meet any of the listings in Appendix I, Subpart P, and Regulation No. 4.  (Id.).  The ALJ also considered Shupe's mental impairment claim and found that Shupe's symptoms of depression and anxiety were just "[normal] emotional reactions" to his general situation. (Id. at 26-27).  The ALJ further found that Shupe's adjustment disorder was not itself disabling since he was able to function on a daily basis, manage his own finances, and get along with other people.  (Id. at 27).

At Step Four, the ALJ further concluded that Shupe had the RFC to perform sedentary work.  (Id. at 26, 28, 29).  He noted that Shupe could stand/walk for a total of four hours in an eight-hour workday, and sit for a total of seven hours in one hour intervals, after each of which he would have to take a one minute "stretch break." (Id. at

26).  However, because Shupe's "past relevant work" as a carpenter, service technician, and production manager required a heavy level of exertion, the ALJ concluded that Shupe could not perform his "past relevant work."  (Id. at 27, 29).

At Step Five, the ALJ determined that Shupe was a "younger individual" with a high school education and "non/transferable, semi/skilled work experience."  (Id. at 28, 29).  Citing the testimony of the vocational expert, the ALJ found that a person of Shupe's age, education, and RFC could perform certain sedentary jobs that exist in "significant numbers in the national economy," such as charge account clerk, document preparer/scanner, and surveillance system monitor.  (Id.).  Accordingly, the ALJ concluded that Shupe was not disabled within the meaning of the Act from December 6, 2001, his alleged onset date, through the date of the decision.  (Id.).  The ALJ therefore denied his request for benefits.  (Id. at 28).

### D.   Appeals Council

On June 21, 2006, Shupe sought review of the ALJ's decision by the Appeals Council.  (Id. at 14-16).  The Appeals Council denied that request on May 18, 2007.  (Id. at 9-11).

## III.   Applicable Law

### A.   Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law based on the contents of the pleadings.

Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

   The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

   A court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, when the Commissioner's determination is supported by substantial evidence, the decision must be upheld.  See Alston v. Sullivan, 904 F.2d 122, 126-28 (2d Cir. 1990); Ortiz v. Barnhart, No. 00 Civ. 9171 (RWS), 2002 WL 449858, at *4 (S.D.N.Y. Mar. 22, 2002).

  B. Disability Determination

   The term "disability" is defined in the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  In making a determination as to a claimant's disability, the Commissioner

is required to apply the five-step sequential process set forth in 20 C.F.R.

§§ 404.1520 and 416.920.  The Second Circuit has described that familiar process as

follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether, based
> solely on medical evidence, the claimant has an impairment
> which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will
> consider him disabled without considering vocational factors
> such as age, education, and work experience . . . .  Assuming
> the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment,
> he has the [RFC] to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the
> [Commissioner] then determines whether there is other work
> which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

   The claimant bears the burden of proof with respect to the first four steps of

the process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  See 20 C.F.R.

§ 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  However, if the

analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work.  DeChirico, 134 F.3d at 1180.

  In assessing whether a claimant has a disability, the factors to be considered include "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience."  Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

  1. First Step

  The first step of the sequential analysis asks whether the claimant has engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  At Hearing II, Shupe testified that he had not worked since 2001 and was limited to $334 each week from the Worker's Compensation Board.  (See Tr. 592).  Based on this testimony and his earnings record, the ALJ properly concluded that Shupe had not engaged in substantial gainful activity since his alleged onset date, December 6, 2001.  (Id. at 21).  This finding, of course, benefits Shupe.

  2. Second Step

  At the second step of the sequential process, the ALJ must determine whether the claimant has a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one "which significantly limits the abilities and aptitudes necessary to do

most jobs." <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987) (quoting 20 C.F.R.

§§ 404.1520(c) & 404.1521(b)) (internal quotation marks omitted).

       The ALJ determined that Shupe's back and shoulder impairments were

severe in combination.  (Tr. 21).  Given Shupe's history of doctor's visits for these

conditions, substantial evidence supports the ALJ's finding that Serrano's physical

impairments were "severe" as defined by the SSA regulations.  Once again, the ALJ's

finding benefits Shupe.

       3.   <u>Third Step</u>

       The third step of the sequential evaluation asks whether, based solely on the

medical evidence, the claimant has an impairment listed in Appendix I of 20 C.F.R. § 404,

Subpart P ("Appendix I").  If so, the Commissioner must find that the claimaint is

disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ examined the medical records and

determined that Shupe did not meet or medically equal the listed impairments in Appendix

I.  (Tr. 21, 29).  Although the ALJ failed to reference specific sections of Appendix I in

making this determination, a review of Shupe's medical history in conjunction with the

Appendix confirms that the ALJ arrived at the correct conclusion.  (<u>See</u> <u>id.</u>).

       First, there is no evidence of a major dysfunction of a joint as a result of

Shupe's leg or shoulder pain.  <u>See</u> Appendix I § 1.02(A).  A major dysfunction of a joint,

if it involves "one major weight-bearing joint (i.e., hip, knee, or ankle)," would require a

showing of an inability to ambulate effectively.  <u>See</u> <u>id.</u>  There is no evidence that Shupe

could not ambulate effectively because of his leg pain.  (Tr. 232, 233).

If the dysfunction of a joint involved "one major peripheral joint in each upper extremity," such as a shoulder, the claimant would have to show an inability to perform fine and gross movements effectively, as defined in Section 1.00(B)(2)(c) of Appendix I.  See Appendix I § 1.02(B).  Here, there is no evidence that Shupe suffered any significant deficiencies in his left shoulder in addition to his right shoulder.  Moreover, there is no evidence that Shupe could not perform fine and gross movements effectively, as defined in Section 1.00(B)(2)(c).  For example, Shupe could do his own shopping, groom himself, shower without assistance, and walk to and from his car.  (See Tr. 590-92, 596).

Second, Shupe's back pain did not constitute a listing-level musculoskeletal impairment, as defined in Section 1.04 of Appendix I.  Spinal disorders require evidence of either (a) nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if the injury involves the lower back, positive straight-leg raising; (b) spinal arachnoiditis,[17] which results in the need to change positions more than once every two hours; or (c) lumbar spinal stenosis,[18] which results in an inability to ambulate effectively.  Appendix I § 1.04(A)-(C).  To

---

[17]     Arachnoiditis is "inflammation of the arachnoid membrane often with involvement of the subjacent subarachnoid space."  Stedman's.

[18]     Spinal stenosis is a "narrowing of the lumbar spinal column that produces pressure on the nerve roots in sciatica and a condition resembling intermittent claudication and that usually occurs in middle or old age."  Merriam-Webster's Medical Dictionary, Spinal Stenosis, http://www.merriam-webster.com/medical/spinal%20stenosis (last visited August 3, 2010).

ambulate effectively, a claimant must be able to "sustain [] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  Id. § 1.00(B)(2)(b).

Turning to the first of these alternatives, Shupe never exhibited motor loss, as his deep tendon reflexes and sensation were intact.  (Tr. 232, 235, 454, 471).  Moreover, Shupe had no gross muscle weakness.  (Id. at 231-33).  There also is no indication that Shupe exhibited nerve root compression.  Finally, the medical records with respect to straight-leg raising are inconsistent at best.  In April 2002, Dr. McHale reported positive straight-leg raising, but cited "tight hamstrings" as the underlying cause.  (Id. at 469).  In July 2002, Dr. Scheinfeld reported positive straight-leg raising, but six months later, Dr. Segal reported negative straight-leg raising.  (Id. at 231, 278).  In March 2004, Dr. Jacobs reported positive straight-leg raising.  (Id. at 471).

With respect to the second alternative, none of Shupe's numerous treating physicians made a diagnosis of arachnoiditis.  Although the ALJ found that Shupe could sit for only one hour at a time before needing to stretch, Shupe's need for a "stretch break" every hour was not disabling.  (See id. at 26).

Finally, the March 2003 radiology report noted that Shupe had "relative stenosis" at the L4-L5 level.  (See id. at 275).  Nevertheless, there is no indication that Shupe therefore was unable to ambulate effectively.  (See id. at 232, 233) (noting his ability to ambulate "without obvious discomfort").

Shupe's alleged mental impairments do not qualify as an affective disorder or depression under Section 12.04 of Appendix I.  To satisfy the listing criteria under this

section, a claimant must demonstrate either the presence of enumerated symptoms (under

paragraph A), plus daily living, social functioning, concentration or decompensation

difficulties (under paragraph B), or (under paragraph C) a chronic affective disorder of two

years' duration affecting basic work activities, plus repeated decompensation episodes, a

residual disease process, or a one-year history of inability to function outside of a

supportive living arrangement.  Appendix I §§ 12.04 (A)-(C).

Shupe demonstrated several of the listing depression symptoms, including

sleep disturbance and difficulty concentrating.  See id. § 12.04(A)(1).  Despite these

symptoms, however, his daily living activities were at most mildly restricted, since he was

able to concentrate, to read the newspaper, and to function socially.  (Tr. 590-91).  In

addition, the record does not evidence that Shupe had any chronic affective disorder

affecting work activities.

Accordingly, the ALJ properly progressed to the fourth step.

4.    Fourth Step

At the fourth step of the sequential evaluation, an ALJ must determine a

claimant's RFC, i.e., what the claimant can do despite his or her limitations.  20 C.F.R.

§ 404.1545(a)(1).  If the claimant still can perform past work, the ALJ must find that the

claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

The Commissioner's RFC assessment "must address both the remaining

exertional and nonexertional capacities of the individual."  SSR 96-8p, 1996 WL 374184,

at *5.  "Exertional" capacities refer to how a claimant's limitations and physical

restrictions affect the ability to perform the seven strength demands of sitting, standing, walking, lifting, carrying, pushing, and pulling.  Id.  "Nonexertional" capacities refer to "all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions," including postural, manipulative, visual, communicative, and mental restrictions.  Id. at *6.  The RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  Id. at *7; see 20 C.F.R. § 404.1529(c)(4).

Under the SSA regulations, there are five levels of physical exertion requirements for work in the national economy:  sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.  Here, the ALJ concluded that Shupe currently was able to perform "at best, the general demands of sedentary exertion level work."[19]  (Tr. 26).  Work is considered "sedentary" if it

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

---

[19]    The ALJ stated later in his opinion that Shupe could perform some "light exertion level work tasks."  (Tr. 28).  However, the ALJ only discussed "sedentary" exertion level work in the findings section of his decision.  (Id. at 29).

The ALJ concluded that Shupe's previous work experience as a carpenter, service technician, and production manager entailed a "heavy" level of exertion.  (Tr. 27). Work is considered "heavy" if it

> involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567(d).

In rendering his decision, the ALJ found that Shupe can "occasionally lift/carry objects weighing a total of eight pounds with his right-dominant hand and ten pounds frequently with his left hand."  (Tr. 26).  The ALJ also found that Shupe cannot push, pull, or reach with his "upper right extremity more than 50% of the time during a typical workday."  (Id.).  Further, the ALJ found that Shupe "cannot stoop or perform repetitive bending/twisting more than occasionally."  (Id.).

The record supports these conclusions.  For example, in October 2002, Dr. Medley reported that Shupe experienced pain after heavy lifting and with repetitive motions of the shoulder.  (Id. at 256).  Dr. Melcer further reported in his Medical Source Statements on September 24, 2004, and May 22, 2006, that Shupe had limitations in both his upper and lower extremities when pushing and pulling and could never climb, crouch, crawl or stoop. (Id. at 463, 550).

Given these limitations, the ALJ properly concluded that Shupe could not meet the demands of his prior work or "past relevant work."  (Id. at 27, 29).

5.      <u>Fifth Step</u>

At the fifth and final step of the sequential process, the Commissioner has the burden of proving that there is work the claimant can perform based on the claimant's RFC, age, education, and work experience.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(v).  In that regard, the ALJ concluded that Shupe had the RFC to perform work at the sedentary level of exertion, with some non-exertion limitations.  (Tr. 26, 28, 29).

During Hearing II, Mr. Slive, the vocational expert, testified that a person of Shupe's age, education, work experience, and physical limitations could perform unskilled, sedentary work.  (Tr. 602).  As the vocational expert explained, sedentary jobs generally do not involve reaching overhead, pushing, or pulling.  (<u>Id.</u>).  The vocational expert testified that Shupe could perform the jobs of charge account clerk, document preparer-document scanner, and surveillance system monitor.  (<u>Id.</u> at 601-10).  Based on this testimony, the ALJ concluded that Shupe was "capable of performing . . . the jobs mentioned by the vocational expert and that such jobs exist in significant numbers in the national and local economies."  (<u>Id.</u> at 28).

To be sure, Shupe testified at Hearing II that he had to lie down for most of the day several times each month.  (<u>Id.</u> at 595).  Shupe also reported in late 2002 that he could sit for only one-half hour at a time.  (<u>Id.</u> at 252-54).  Despite these claims, the record clearly shows that no physician described Shupe as disabled more than seven months after his work injury.  Moreover, the physicians who described him as "temporarily" or "currently" "totally disabled" apparently were applying the Worker's

Compensation definition of disability—a standard which is not controlling here.  See
DeJesus v. Chater, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995) (Koeltl, D.J.) ("The issue is
whether a person is disabled as that term is defined under the Social Security Act, not
whether a person is 'disabled' or 'partially disabled' for purposes of Worker's
Compensation."); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating
physician's statement that the claimant is disabled cannot itself be determinative.").

   The medical evidence shows that most of the professionals who treated
Shupe found that he had significant physical limitations but was not precluded from
performing sedentary work.  For instance, Melcer reported in 2004 that Shupe could stand
and/or walk for less than two hours in an eight-hour workday, that he must "periodically
alternate between sitting and standing to relieve pain or discomfort," and that he could
balance and kneel occasionally, but could never climb, crouch, crawl, or stoop.  (Tr. 462-
63).  He further concluded that Shupe could reach occasionally and could handle, finger,
and feel constantly, and could occasionally lift less than ten pounds.  (Id. at 462, 464).
This comports with the ALJ's conclusion that Shupe could perform sedentary work.  In
his papers, Shupe has failed to show that the ALJ's determination that he was capable of
functioning at that level, and, therefore, that there was work he could perform in the
national economy, was legally incorrect or not supported by substantial evidence.  Shupe
also has not shown that his mental impairments affected his ability to perform sedentary
work.  Having failed to show that the ALJ's determination at Step Five is legally or
factually incorrect, Shupe is not entitled to Social Security Disability Insurance benefits.

IV.    Conclusion

   For the foregoing reasons, Shupe's motion for judgment on the pleadings should be denied, the Commissioner's cross-motion for the same relief should be granted, and the Clerk of the Court should be requested to close this case.

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

   The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Barbara S. Jones and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Jones.  The failure to file timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:  New York, New York
    August 3, 2010

             FRANK MAAS
           United States Magistrate Judge

34

Copies to:

Carol Sue Goldstein, Esq.
Fax:  (914) 782-1744

Leslie A. Ramirez-Fisher
Assistant United States Attorney
Fax:  (212) 637-2750